PHILLIP A. TALBERT
United States Attorney
KEVIN C. KHASIGIAN
Assistant U. S. Attorney
501 I Street, Suite 10-100
Sacramento, CA  95814
Telephone:  (916) 554-2700

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>     v.<br><br>REAL PROPERTY LOCATED AT 6212 NORTH POINT WAY, SACRAMENTO, CALIFORNIA, SACRAMENTO COUNTY, APN: 030-0840-045-0000, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,<br><br>2022 MERCEDES BENZ GLE350, VIN: 4JGFB4KE4NA626006, CALIFORNIA LICENSE NUMBER 8ZDG249, AND<br><br>2022 MERCEDES BENZ AMG EQS V4, VIN: W1KCG5FB9NA009950, CALIFORNIA LICENSE NUMBER 9BRE850,<br><br>         Defendants. | VERIFIED COMPLAINT FOR FORFEITURE *IN REM* |

The United States of America, by and through its attorney, Phillip A. Talbert, United States Attorney for the Eastern District of California, for its verified complaint alleges, upon information and belief, as follows:

1

Verified Complaint for Forfeiture *In Rem*

## NATURE OF ACTION

1. This is a civil action *in rem*, brought by the United States for forfeiture of real property and vehicles connected to a fraud scheme perpetrated in the Eastern District of California and elsewhere in the United States.

## JURISDICTION AND VENUE

2. This action is brought by the United States of America pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C), seeking the forfeiture of three assets purchased with funds traceable to fraud proceeds and/or involved in money laundering transactions, including the following:

   a. Real Property at 6212 North Point Way, Sacramento, California, Sacramento County, APN: 030-0840-045-0000, including all appurtenances and improvements thereto, and more fully described in Exhibit A ("defendant property"),

   b. 2022 Mercedes Benz GLE350, VIN: 4JGFB4KE4NA626006, California license number 8ZDG249, and

   c. 2022 Mercedes Benz AMG EQS V4, VIN: W1KCG5FB9NA009950, California license number 9BRE850

Collectively, the "defendant assets."

3. This Court has jurisdiction over an action commenced by the United States under Title 28, United States Code, Section 1345, over an action for forfeiture under Title 28, United States Code, Section 1355(a), and over this particular action under Title 18, United States Code, Section 981.

4. This district is a proper venue pursuant to Title 28, United States Code, Section 1355, because the acts giving rise to this *in rem* forfeiture action occurred in this district, and pursuant to Title 28, United States Code, Section 1395, because the defendant assets are located in or were seized in this district.

5. Since 2022, federal law enforcement has investigated a Ponzi-type investment scheme orchestrated by an individual with initials "M.D.," who defrauded more than one hundred individuals through their company, CREATIVE LEGAL FUNDINGS of CA (hereinafter "CLF" or "CREATIVE LEGAL"). CLF, via M.D. as owner and operator, purportedly raised money from investors for the purpose of loaning those funds to "accident attorneys" to finance the law firms' activities. M.D. falsely told investors they would earn a 10 percent monthly rate of return on their investments, which is 120 percent per year. M.D. did not invest the money as represented to their investors, i.e., M.D. did not loan

investor funds to personal injury attorneys for sizeable monthly investment returns. Instead, M.D. used the funds derived from the illegal scheme to fund their lifestyle, purchase assets such as the defendant assets, and pay back previous investors. To date, law enforcement has identified at least 130 investors who sustained losses of over $4 million dollars from the fraud scheme.

6. In mid-2023, over forty investor-victims sued M.D. and CLF in Washington State for fraud, negligent misrepresentation, and other fraud- and contract-based theories.[1] The investor-victims, each a resident of Washington State, allege that they collectively lost nearly $1.5 million in the CLF investment scheme after trusting M.D.'s claims about the lucrative nature and safety of their investments with CLF. Particularly, the complaint alleged:

- After forming CLF in December 2020, M.D. approached several investor-victims about an investment opportunity with CLF, which M.D. described as an investment vehicle specializing in loans to "accident attorneys;"
- M.D. claimed that CLF already had $3,250,000 in cash assets that were used to finance "accident attorneys" and that investing in CLF had only upside with high guaranteed returns;
- M.D. represented that the investments were "safe" with virtually no risk of loss;
- M.D. told investor-victims that CLF had immediate access to $45,000,000 should CLF need money for any reason;
- M.D. had several investor-victims sign a "General Partnership Agreement" with CLF that allowed victims to make monthly draws, would pay investor-victims monthly amounts, and/or would allow "interest" to roll over;
- M.D. promised to return investor-victims' money in whole, within 30 days of written request. However, several investor-victims had requested their money returned, but M.D. did not do so, offering excuses such as CLF's bank accounts being frozen or that the money had been sent and the investor-victim needed to consult their own bank for answers;

---

[1] *C.B., et al., v. M.D., et al.*, Case No. 23-2-05956-1, in the Pierce County Washington Superior Court, is currently still active.

3

- In September 2022, M.D. informed investor-victims they were subject to a money laundering investigation and therefore the investments would not receive their monthly payments or a return of their investments.

7. In August 2023, forty-one CLF investor-victims sued M.D. and CLF in Sacramento Superior Court for fraud, negligent misrepresentation, and other fraud-, security- and contract-based theories.[2] The forty-one investor-victims, residents of California and other states, allege that they collectively lost over $2.6 million in the CLF investment scheme. The Sacramento Complaint largely mirrors the allegations made against CLF and M.D. in the Washington Complaint, including that M.D. represented they were investing in "accident attorney" loans and that high returns were guaranteed and low-risk. Further, M.D. said that their funds would be used solely for investment purposes and the money would be returned upon 30 days' notice, and that CLF would be audited to verify all transactions. The Sacramento lawsuit alleges that M.D.'s representations were, in fact, false, and investor's money was used to fund M.D.'s lifestyle, pay back other investors, and purchase luxury cars and property.

8. The Sacramento Complaint further alleges that M.D. recruited investors for CLF as early as April 2021 and that some investor-victims invested their life savings believing that the investment with M.D./CLF would drastically improve their lives. Many of the investor-victims signed investment agreements and were attracted to the investment opportunity after M.D. promoted their "success" on social media by posting pictures of their extensive traveling, beauty pageants, salon visits, and enjoying private jet travel. At some point in early 2023, the scheme started to crumble and M.D. stopped making payments to the victims altogether. The victims demanded their promised returns and/or their money back, but M.D. provided false excuses or completely avoided them and did not pay the victims.

9. Starting in mid-2023, law enforcement began interviewing individuals who had invested with CLF based on M.D.'s representations that it was a lucrative and safe investment. Similar to the victims who are plaintiffs in the civil suits filed in Washington and Sacramento, these individuals told law enforcement that M.D. represented that their money would be used to finance "accident attorneys" and they would earn a 10 percent rate of monthly return. The individuals provided specific details of

---

[2] *G.B., et al., v. M.D., et al.*, Case No. 23-CV-006753, in the Sacramento County California Superior Court, is currently still active.

4

Verified Complaint for Forfeiture *In Rem*

M.D.'s tactics to entice investors—not only to make their original investments, but to also invest their monthly dividends and returns rather than receive a payout. M.D. would conduct group investor meetings and provide details about CLF's loans to various law firms—such as interest rates, balances, and monthly payments—to mislead investors about the safety of the investment. One investor, M.W., explained:

> *M.D. presented information on the clients/attorneys to whom CLF was loaning money, but M.W. does not recall any of these names. M.W. recalled M.D. presenting information to the group on a client who borrowed approximately $100,000, at an approximate interest rate of 30 percent, and was paying approximately $35,000 to CLF each month. M.W. recalled M.D. presenting information on another client who was paying $14,000 to CLF each month.*

10. When the monthly dividends slowed or stopped altogether, the individuals described M.D.'s manipulation and subterfuge to avoid responsibility and keep the fraud alive. One investor, K.F., explained:

> *K.F. stated that, in January 2023, his monthly rate of return payments were late and M.D. was not actively responding to K.F.'s text messages and telephone calls. On one occasion when M.D. did respond, they sent K.F. a photograph of a bank meeting that M.D. was purportedly attending. K.F. was able to locate the same photograph that M.D. sent him as a stock photograph that was located on the internet. There was another instance where M.D. sent K.F. a photograph of a bank statement that appeared to have been altered that contained a high bank account balance. It is K.F.'s belief that M.D. fabricated the bank statement to make it appear the bank account had a high bank account balance. K.F. stated he was looking at a photograph that showed a bank statement that contained a bank account balance of around $15 million and the bank account was held at Bank of America. K.F. stated the font located on the bank account statement seemed "off" and the bank statement did not appear it came from Bank of America.*

11. Law enforcement reviewed bank records for M.D., CLF, and others connected to the fraud from 2019 to 2023, analyzing accounts that directly received and/or distribute investor funds, via transfers, wires, checks and through the use of the Zelle electronic payment system. Law enforcement relied on records provided by investor-victims in the civil lawsuits, as well as other information revealing the fraud and financial maneuvering, to isolate and trace investment funds into M.D. controlled accounts. Law enforcement determined that most investor funds were deposited into a first layer account and then circulated to additional M.D. controlled accounts. These accounts under M.D.'s

control were used to make lulling payments to existing investors, fund M.D.'s lifestyle, or purchase assets. The bank account analysis confirmed the civil lawsuit allegations and law enforcement interviews of victims concerning the extent and existence of the fraud. The bank account analysis further exposed the fraud in a purely financial way, specifically, that the records identified many large, even numbered deposits or credits, such as $10,000 or $50,000 into a M.D. controlled bank account (*corresponding to a specific person via a check or wire*), followed by monthly payments back to the person from M.D. in a much smaller amount. This same pattern was evident with many individuals and confirmed the Ponzi-like nature of the fraud scheme.

12. Law enforcement's bank record analysis further confirmed that M.D. did not invest the money as represented to their investor-victims, i.e., loaning the investment funds to personal injury attorneys for sizeable monthly investment returns. Instead, M.D. used the funds derived from the illegal scheme to fund their lifestyle and purchase assets such as the real property and vehicles.

### 6212 North Point Way, Sacramento, CA

13. In July 2022, M.D. purchased a luxury residence at 6212 North Point Way in Sacramento, California for about $1,000,000. M.D. took title to the property in their name and purchased the property with all cash—no financing. On June 1, 2022, M.D. opened escrow for the property with a $10,000 check drawn from Bank of America account ending in *8117, an account M.D. opened in the name of "Sweetie's Little Angels LLC." This business bank account was used to further the investment scheme, receiving approximately $740,000 in fraud proceeds from investor-victims and making lulling payments to existing investor-victims of approximately $496,000. On July 5, 2022, M.D. wired approximately $991,199.99 from their Bank of America account ending in *8843 to close escrow, of which at least $356,000 is directly traceable to investor-victims. M.D. opened account *8843 in February 2022 with an ex-partner. This joint bank account was used to further the investment scheme, receiving approximately $740,000 in fraud proceeds from investor-victims and making lulling payments of approximately $210,000.

///

///

### 2022 Mercedes-Benz GLE 350

14. In December 2021, M.D. and an ex-partner visited Mercedes-Benz of Fairfield to purchase a new luxury vehicle. M.D. chose to purchase a 2022 Mercedes-Benz GLE 350, with an extended warranty plan, and registered the Mercedes in their name. The total cost for the vehicle purchase was $92,696.50, which M.D. paid with a cashier's check drawn from Bank of America account ending in *8843. Law enforcement traced the funds used to purchase the Mercedes and determined that all of the funds—the entire $92,696.50—can be traced to investor-victims.

15. On October 23, 2023, law enforcement seized the Mercedes-Benz GLE 350 pursuant to a seizure warrant issued by the Honorable U.S. Magistrate Judge Carolyn K. Delaney.

### 2022 Mercedes-Benz AMG EQS V4

16. In June 2022, M.D. and a colleague visited Mercedes-Benz of Sacramento to purchase another new luxury vehicle. M.D. chose to purchase a 2022 Mercedes-Benz AMG EQS V4 for $226,329.36, paying $150,000 in a cashier's check from Bank of America account *8843 and financing the remainder. Law enforcement traced the funds used to purchase the Mercedes and determined that $52,441.96 can be traced to investor-victims.

17. On October 23, 2023, law enforcement seized the Mercedes-Benz AMG EQS V4 pursuant to a seizure warrant issued by the Honorable U.S. Magistrate Judge Carolyn K. Delaney.

### FIRST CLAIM FOR RELIEF
### 18 U.S.C. § 981(a)(1)(C)

18. Paragraphs one through seventeen above are incorporated by reference as though fully set forth herein.

19. The United States alleges that the defendant assets were derived from proceeds traceable to an offense constituting a "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), which incorporates the definition of "specified unlawful activity" found in 18 U.S.C. § 1961(1) and is therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C). Wire fraud, a violation of 18 U.S.C. § 1343 constitutes "specified unlawful activity" as defined in § 1961(1).

20. The United States further alleges in support of it First Claim that there existed a scheme

or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or the concealment of material facts; and the statements made or facts omitted as part of the scheme were material; there was an intent to defraud; and wire communications were used to carry out or attempt to carry out an essential part of the scheme.

21. By reason of the above, the defendant assets are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C).

### SECOND CLAIM FOR RELIEF
### 18 U.S.C. § 981(a)(1)(A)

22. Paragraphs one through seventeen above are incorporated by reference as though fully set forth herein.

23. The United States alleges that the defendant assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) because they were involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957. Specifically, certain individuals knowingly engaged or attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from a specified unlawful activity. Wire fraud, a violation of 18 U.S.C. § 1343, and money laundering, a violation of 18 U.S.C. § 1957, constitute "specified unlawful activity" as defined in § 1961(1).

24. By reason of the above, the defendant assets are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

25. The United States does not request authority from the Court to seize the defendant property at this time. The United States will, as provided by 18 U.S.C. § 985(b)(1) and (c)(1):

   a. Post notice of this action and the Complaint on the defendant property,

   b. Serve notice of this action on the defendant property owner along with a copy of this Complaint; and

   c. File with the county where the property is located a lis pendens providing notice of the property's status as defendant in this *in rem* forfeiture action.

26. Title 18 U.S.C. § 985(c)(3) provides that, because the United States will post notice of this Complaint on the defendant property, it is not necessary for the Court to issue an arrest warrant *in*

*rem*, or to take any other action to establish *in rem* jurisdiction over the defendant property.

### PRAYER FOR RELIEF

WHEREFORE, the United States prays that:

1. Process issue according to the procedures of this Court in causes of action *in rem*;
2. Any person having an interest in said defendant assets be given notice to file a claim and to answer the complaint;
3. The Court enter a judgment of forfeiture of said defendant assets to the United States; and
4. The Court grant such other relief as may be proper.

Dated: 3/15/2024            PHILLIP A. TALBERT
                            United States Attorney

                    By:     /s/ Kevin C. Khasigian
                            KEVIN C. KHASIGIAN
                            Assistant U.S. Attorney

**VERIFICATION**

I, Christopher Fitzpatrick, hereby verify and declare under penalty of perjury that I am a Special Agent with the United States Department of the Treasury, Internal Revenue Service – Criminal Investigation, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States and information supplied to me by other law enforcement officers, together with others, as a Special Agent with the United States Department of the Treasury, Internal Revenue Service – Criminal Investigation.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated:  3/15/24

/s/ Christopher Fitzpatrick
CHRISTOPHER FITZPATRICK
Special Agent
United States Department of the Treasury
Internal Revenue Service – Criminal Investigation

(Signature retained by attorney)

## **EXHIBIT A**
Real Property at 6212 North Point Way, Sacramento, California

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SACRAMENTO, COUNTY OF SACRAMENTO, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 3, AS SHOWN ON THE FINAL MAP OF RIVER FRONT ESTATES #2, FILED IN THE OFFICE OF THE RECORDER OF SACRAMENTO COUNTY, CALIFORNIA ON SEPTEMBER 28, 2000 IN BOOK 276 OF MAPS, AT PAGE 7.

APN: 030-0840-045-0000